UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

UNITED STATES OF AMERICA,    )
    )
    Plaintiff,    )
    )
v.    ) Case No. 1:24 CR 83 SNLJ (ACL)
    )
JEFFERY JAMES REED,    )
    )
    Defendant.    )

## REPORT AND RECOMMENDATION

This matter is before the Court[1] on Defendant Jeffery James Reed's Motion to Suppress Evidence (Doc. 39) seized from the premises located at 1234 Wayne 419, Williamsville, Missouri, the location of his residence and farm.

Reed is a farmer in rural Wayne County, Missouri. He was identified as a suspect in an arson fire that caused more than one million dollars in damage to a neighboring farming operation. Four days after the fire, a Search Warrant was executed at Reed's property and various items were seized by law enforcement.

Reed first claims that the "search warrant affidavit lacked a factual nexus to the subject premises," (Doc. 42 at 4) resulting in a lack of probable cause making the Search Warrant facially invalid, *id*. at 9. He notes that the Affidavit states the premises is where "a suspect of an arson investigation" is "located," but does not indicate 1234 Wayne 419

---

[1] Pretrial matters have been referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).

is "Reed's residence, belongs to Reed, is farmland, is a farm operated by Reed, or is otherwise connected to Reed in any manner." *Id*. at 5.

Next, Reed argues "the Affidavit is devoid of any information showing the evidence sought[, including electronic devices] would be found" in his home. *Id*. at 9-15. He asserts the Search Warrant lacked probable cause, because there is nothing in the Affidavit "that directly ties the place to be searched to the objects of the search, or to the underlying criminal investigation." *Id*. at 13. He claims "the Fourth Amendment does not permit the type of significant inferential leaps as would be required to determine the Affidavit set forth a 'substantial basis' to conclude the objects of the search would be found at the" listed address. *Id*.

Finally, Reed alleges "the lack of a nexus to Reed's residence would have been apparent to reasonable officers, precluding application of the 'good faith' exception and mandating suppression of the evidence obtained from the search." *Id*. at 17.

The Government opposes the Motion arguing that when examining the "totality of the information in the affidavit there is clearly sufficient probable cause to connect Jeff Reed to the arson, and to connect the target premises to Reed." (Doc. 47 at 9.) Additionally, the Government asserts there was "a sufficient connection between the arson and the evidence sought to be seized, and a fair probability they would be located at Reed's residence." *Id*. at 10. Lastly, the Government argues that even if the Search Warrant was defective in some way, the good faith exception to the warrant requirement applies because the affiant reasonably relied on the issuing Judge's determination of probable cause. Thus, suppression would not be warranted "as any mistake would have

been on the part of the issuing Court and suppression would do nothing to deter police misconduct as contemplated by the exclusionary rule." *Id*. at 16.

Although the matter was set for an evidentiary hearing and the Government issued a subpoena for the officer who signed the Search Warrant, no one testified.  When the undersigned asked the Government attorney "how many witnesses do you have…?" (Doc. 55 at 2.)  He announced, "we don't have any.  The motion is basically an attack on the sufficiency of the search warrant" offered as Government Exhibit #1 and Defendant's Exhibits A and B.  *Id*.  The Defendant also offered Exhibit C, the inventory for the Search Warrant.  The Government did not oppose admission of Exhibit C.  The Government further stated that even if the Court were to apply the good-faith exception no additional information was required because although "[t]he law allows the Court to consider information that was known to the officers but not placed in the Affidavit . . . There's simply no additional information that they had that was material to the issue of probable cause at that point in time." *Id*. at 3.

Defense counsel argued that the Affiant's testimony was necessary to determine "whether or not the officer was reasonable in relying on the information provided in the... warrant." *Id*. at 5.  He asserted that there were a number of omissions in the Affidavit, including that the Affiant was related to the "victim" by marriage.  That said, he acknowledged that the Defendant had not filed a request for a *Franks* hearing and had not subpoenaed any witnesses.  Defense counsel anticipated that the Affiant would be testifying considering the subpoena that was issued.

The Government responded that the issue before the Court is extremely narrow. The "question is whether or not there was a substantial basis for the state judge to issue this Search Warrant based on the totality of the information in the Affidavit . . . we're stuck with whatever is in the affidavit, not what other people knew or hypothetically knew or whether they liked or disliked this defendant…" *Id*. at 8-9.  If the Court concludes the four corners did not provide the issuing judge with a substantial basis to find probable cause to issue the warrant, then and only then do we look at the good-faith exception." *Id*. at 9.  The Government reiterated that since the Affiant had no additional material evidence related to the probable cause question, "[t]he question becomes . . . would a reasonable objective police officer" be able to rely on the issuing judge's finding of probable cause.  *Id*.

Considering the developments during the hearing, defense counsel requested leave to reschedule the hearing to "issue our own subpoena to the detective and get into those issues and then supplement it with a *Franks* motion." *Id*. at 10.  The Government countered that the Defendant had a year to file a *Franks* motion.  Further stating "there's nothing out there that would tend to indicate that any of the information in this Affidavit was either deliberately false or was made with reckless disregard for the truth." *Id*. at 11-12.  The Defendant replied, "we would have explored those issues on the good-faith exception."  The undersigned took the issue under advisement.  Following the hearing, the Defendant submitted supplemental briefing and a request for leave to file his Motion to Suppress Evidence Pursuant to *Franks v. Delaware*. (Doc. 59.)  The *Franks* Motion will be discussed in Part II.D.

In consideration of the record before the Court, the undersigned recommends that the following findings of fact and conclusions of law be adopted and that the Defendant's Motion to Suppress Evidence and Motion for *Frank's* Hearing be denied.

## I.  Findings of Fact

A fire was intentionally set at the farming operation of "Buff Beef" owned by Stanley and Mary Buffington on August 22, 2023, resulting in more than one million dollars in damages.  The National Response Team of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) arrived on-scene the day after the fire to join agents from three nearby ATF offices to investigate the fire.  A news release issued on August 24, stated that "[t]he fire is being jointly investigated by the ATF, Wayne County Sheriff's Office, Missouri State Highway Patrol, and the Missouri Fire Marshals Office."  (Doc. 62-1 at 1.)

Four days after the fire, a Search Warrant was executed at "the premises located at 1234 Wayne 419, Williamsville, Missouri 63967."  (Doc. 39-2 at 4-7.)  Although the "evidence to be searched for" was described as items "that could potentially lead to further details surrounding this arson investigation…," the Search Warrant expressed that the evidence sought pertained to a homicide.  *Id*. at 1.  The Affiant did not directly state that 1234 Wayne 419 was Reed's home or the location of "Rolling Shoals Farm."  The Affidavit noted that "Reed owns a farm approximately two nautical miles from the Buff Beef farm." *Id*. at 4.

The Affidavit also relayed that in the past, Buffington and Reed had been friends. They also enjoyed a barter agreement in which Reed utilized farm equipment belonging

to Buffington in exchange for Reed's corn and other agricultural products.  Toward the end of 2022, the pair had a falling out over monies owed between them.  In the fall of 2022, Reed sent Buffington an invoice for over $48,000.  Buffington indicated he paid approximately $32,000 to Rolling Shoals Farm.  He also sent Reed an invoice for amounts due that totaled around $92,000.  Reed told investigators that the issues between him and Buffington were over $13,000, which was inconsistent with the documents received during the investigation.

According to Buffington, Reed also believed that Buffington had flirted with Reed's wife.  Buffington added that Reed threatened to "kill him if [Buffington] looked at [Reed']s wife again."  *Id*. at 5.

In describing the more than one million dollars of estimated damages caused by the fire, the Affidavit noted that fire investigators found 30-minute burn time Orion brand road flares and fuel on "burned, and non-burned machinery, ground, and building parts."  *Id*. at 4.  Investigators also recovered videos from a Menard's store in Poplar Bluff that showed Reed purchasing a total of thirty, 30-minute burn time Orion brand road flares during trips to the store on July 30 and August 18, 2023.  Other items Reed purchased included: five cigarette lighters, two cans of spray paint, a roll of tape, a pair of 14-inch chemical gloves, ten hose clamps, 25 feet of discharge hose, one 17-in-1 multi-tool, safety glasses, landscape fabric, one box cutter knife, and work gloves.  Reed paid cash for all the items.

The search warrant application-affidavit (the "Affidavit") outlined the following information in support of Trooper Wilson's belief that "evidence related to the crime currently under investigation is located on the described premises." (Doc. 39-2 at 7.)

1. On Tuesday, August 22, 2023, the criminal investigative unit of the Missouri State Highway Patrol was requested to assist with an arson investigation in Wayne County. The location of the arson was at 36°56'58 North, -90°31'30 West, and is located in Wayne County, Missouri. This is described as an agricultural business, Buff Beef. During the investigation, it was determined three large-scale buildings were destroyed by fire. Fire Investigators determined that each building was a separate point of origin and that the fire had not communicated between the buildings.

2. Thirty-Minute (30) burn time Orion Brand Road flares and fuel were located on burned, and non-burned machinery, ground, and building parts. Gasoline containers were located inside portions of the burned buildings. Approximately fifteen (Estimate only) pieces of farm machinery were destroyed by fire. Several of these pieces of equipment were not in the buildings that burnt. The total loss due to the fire exceeds one million dollars.

3. During interviews it was determined the victim, Stanley Buffington, named one particular person who had a conflict with him; Jeff Reed. Mr. Reed owns a farm approximately two nautical miles from the Buff Beef farm and the two were previously friends. In approximately the fall of 2022, the friendship ended as Mr. Reed accused Mr. Buffington of owing him a substantial amount of money. Mr. Buffington eventually agreed to pay Mr. Reed a portion of what he said he owed, but Mr. Reed did not believe it was enough. Mr. Reed had knowledge and layout information of Mr. Buffington's farm, buildings, safe, and equipment. It should be noted: that the safe at Buffington's farm was opened with a torch but nothing was believed to be stolen; furthermore, Mr. Buffington typically keeps fifty to one hundred thousand dollars inside of the safe but had taken it out. Mr. Reed was one of the few people who had direct knowledge of the cash amount Mr. Buffington kept inside the safe at the business. Jeff Reed had also made prior threatening comments about Mr. Buffington flirting with his wife; making the comment to Mr. Buffington that he would kill him if he looked at his wife again.

4. Mr. Buffington also said in the fall of 2022 he, Buff Beef Farm, received a bill from Mr. Reed, Rolling Shoals Farm Inc., for an amount of over $48,000.00 Mr. Buffington said up to this point he and Mr. Reed had an agreement in place where Mr. Reed was able to use Mr. Buffington's equipment and in turn, Mr. Reed would provide shelled corn, or other agricultural products as a form of payment. Mr. Buffington said he contacted Mr. Reed and asked him why he was sent a bill since they had an agreement in place. Mr. Buffington said Mr. Reed said he wanted the money instead. Mr. Buffington said he paid approximately $32,000.00 to Rolling Shoals. Mr. Buffington said he then had a bill sent to Rolling Shoals for $92,000.00. Mr. Buffington also said he also paid $32,000.00 to Rolling Shoals farms.

5. During the course of this investigation investigators were provided invoices from both Rolling Shoals and Buff Beef Farms. These were provided by Mary Buffington. The first invoice is dated August 31, 2022, and is from Rolling Shoals to Stan Buffington for $16,110.67. An invoice dated November 29, 2022, from Buff Beef to Rolling Shoals Farms. The grand total amount billed to Rolling Shoals by Buff Beef is $76,622.96. The invoice sent to Rolling Shoals was sent by registered mail.

6. In an interview with Mr. Reed, he stated the issues between him, and Mr. Buffington were over $13,000.00. With the documents provided it is apparent Mr. Reed lied to investigators about the amount of money he owed to Mr. Buffington. Mr. Reed also said he received a phone call from Jimmy Freeman, who is a farm hand for Mr. Buffington, on the morning of the fire. Mr. Reed said Mr. Freeman threatened him during this phone call and a short time later he observed a vehicle drive up and park, shutting the headlights off, approximately 200-300 yards down the lane from his residence.

Mr. Reed said it was Mr. Freeman's vehicle. Mr. Reed said he exited his home with a rifle and took position in a tree line. He further stated he would have shot Mr. Freeman if he had entered his property. This observation was supposed to have taken place a little after 3:00 a.m. When Mr. Freeman was interviewed, he admitted to making the phone call but said he had not been to or near Mr. Reed's house that night or anytime since he did not know where Mr. Reed lived.

7. On August 25, 2023, investigators located videos from Menards in Poplar Bluff Missouri. These videos depict Mr. Reed purchasing three (4) packs of 30-minute burn-time Orion brand flares, safety glasses, landscape fabric (100-foot roll), Gerber brand box cutter knife, and Mechanics Wear brand work gloves. These purchases were made on Sunday, July 30, 2023, and payment was made in cash. A second video depicts Mr. Reed purchasing six (6) packages of the same flares, five Bic brand cigarette lighters, two cans of black spray paint, a roll of Gorilla brand tape, a pair of 14-inch Nitrile brand chemical gloves, a pack of ten (10) hose clamps, twenty-five foot of discharge hose, and a Gerber brand truss seventeen in one multitool. These purchases were made on Friday, August 18, 2023, and cash was used to make these purchases. The total confirmed amount of individual 30-minute Orion flares which was confirmed Mr. Reed had purchased was thirty (30). During both visits to Menards, Mr. Reed was driving a dark-colored Dodge Dually truck, which he parked on the east side of the parking lot, where there are no cameras and well away from the building. Mr. Reed does however drive past the front of the store when leaving the parking lot.

(Doc. 39-2 at 4-7.)

Trooper Wilson identified the evidence to be searched for as follows:

(1) computers and other electronic smart devices (Including cellular phones);

(2) any written notes/documentation pertaining to information *leading up to or explaining the arson*;

(3) Gorilla Tape

(4) Orion Flares and related packaging

(5) Lighters

(6) Chemical Gloves and Utility Gloves

(7) Vehicle's which could store vital GPS information

(8) Any clothing that may have potential evidence *related to the arson investigation*; including clothing with welding defects, fuel contaminates, smoke, etc.

(9) The clothing worn by Mr. Reed at the time he purchased flares and other
materials at Menards in Poplar Bluff, Missouri.

(10) All of these items are evidence in this investigation that could potentially lead
to further details *surrounding this arson investigation* in that the described
items could incriminate or exclude possible witnesses/suspects.

(Doc. 39-2 at 4-7 (emphasis added).)

At 10:12 p.m., Wayne County Prosecuting Attorney Ginger Koller Joyner

affirmed to Judge Schrum that she reviewed the "Affidavit and Application" and applies

for the requested "search warrant based upon th[e] Affidavit and place my signature upon

this Application." *Id*. at 8.  In signing the Application, the Prosecutor stated:

> knowing that false statements herein are punishable by law and/or being duly
> sworn, deposes and states upon information and belief that *evidence of a crime
> related to the criminal offense/s of arson* are currently present on the described
> premises. Application for the issuance of this search warrant is hereby made. The
> basis of this belief is detailed in the above Affidavit provided by the Affiant and
> said information is submitted in conjunction with this Application as a basis upon
> which this Court may find the existence of probable cause for the issuance of said
> warrant.

*Id*.  (emphasis added.)  Trooper Wilson subscribed and swore to the truthfulness of the

Application and Affidavit before Associate Circuit Judge Scotty J. Schrum under oath on

August 25, 2023, at 10:29 p.m.

Judge Schrum authorized the Search Warrant at 10:30 p.m.  The Search Warrant

provided a further description of the location to be searched:

> The premises include a primary residence, entire land, any and all
> outbuildings, shops, barns, or sheds, as well as any automobiles, or utility vehicles
> on the premises.
> .

The premises are specifically described as follows: 1234 Wayne 419, Williamsville, Missouri 63967. It is described as a single-story residence that faces west. There is an outbuilding located southwest of the property. A driveway leads from County Road 419 to the east portion of the premises which leads to a large barn/shop.

*Id*. As to the evidence to be searched for, the Search Warrant included the same list of ten items identified in Trooper Wilson's Affidavit. The list included computer and electronic devices, plus written notes or documentation "*leading up to or explaining the arson*," as well as vehicle's which could store vital GPS information. *Id*. (emphasis added). Items that could have been used in the arson were listed, including Gorilla tape, Orion Flares and related packaging, lighters, chemical and utility gloves, plus "[a]ny clothing that may have potential evidence *related to the arson investigation*; including clothing with welding defects, fuel contaminates, smoke, etc." *Id*. (emphasis added). The list also included "clothing worn by Mr. Reed at the time he purchased flares and other materials at Menards in Poplar Bluff, Missouri." *Id*. While listed as "item" 10, the last sentence explained that "[a]ll of these items are evidence in this investigation that could potentially *lead to further details surrounding this arson investigation* in that the described items could incriminate or exclude possible witnesses/suspects." *Id*. at 1-2 (emphasis added).

Officers arrived at the described premises to execute the Search Warrant the following day, at 4:00 p.m. The premises were seized at 4:10 p.m., and the search was completed by 6:08 p.m. The inventory of items seized is below.

| ITEM NO. | ITEM | LOCATION |
|---|---|---|
| #1 | 1 Roll Black Gorilla Tape | Garage #1 in Black Tool Box |
| #2 | 1 iPhone w/ Pink Case (Andrea's) | located on couch in Front Room |
| #3 | File/Documents From Buffingtons | located on Printer - Front Room |
| #4 | 4 Bic lighters | Top Kitchen Island Drawer |
| #5 | Dell PC Inspiron 3670 #TJJXCV2 | Front Room Desk Area |
| #6 | HP Protect Smart Laptop #5CD 43870CW | Master Bedroom on Bed |
| #7 | Menards Receipt | Dining Room on Cabinet |
| #8 | Menards Receipt | Found in Pass Floor Board Maroon Dodge |
| #9 | Thor 4 Night Vision Monocular | Found in Kitchen Near Back Door |
| #10 | iPhone Black Case | Found inside Vault/Top Shelf. |
| #11 | White Cowboy Hat | Black Dodge - Back Seat |
| #12 | 2 Hard Drive 2 Flash Drives | Found inside Safe in Box |
| #13 | 1 Silver Hard Drive | Found inside Safe |
| #14 | 1 Silver Apple laptop | Found inside Black Truck in a Backpack |
| #15 | 2 Benzomatic torches (yellow) | Passenger Floor Black Truck |

*See* Doc. 39-2 at 9, Search Warrant Inventory.

Reed requests that all evidence obtained by law enforcement be suppressed.


## II. Conclusions of Law

First, Reed argues "the Affidavit failed to connect the target property to Reed (let alone establish that he lived there) and, therefore, lacked the requisite nexus to support probable cause." (Doc. 48 at 2.)  He claims that the Government's assertion that the Affidavit "points only to Reed as the suspected arsonist" requires the Court to "weigh the facts pertaining to each person against each other and reach a factual finding as to who the affiant most likely referred to as 'a suspect,' if indeed it was one specific person…" *Id*. at 3.  Furthermore, Reed argues, "[w]hile the affiant may very well have intended to mean Reed lived at the premises by stating 'a suspect' was 'located' there, he did not say that, and the Court cannot now take the liberty of assuming that critical information." *Id*.

Additionally, Reed claims "the Affidavit here remains devoid of any information establishing the evidence sought would be found at the target premises, requiring suppression of the same." *Id*. at 4.  Lastly, Reed avers the "good faith" exception cannot save the Search Warrant due to the deficiencies in the Affidavit.

The Government asserts there was "a sufficient connection between the arson and the evidence sought to be seized, and a fair probability they would be located at Reed's residence." (Doc. 47 at 10.)  The Government further contends that if there was a defect in the Search Warrant, the good faith exception to the warrant requirement applies because the affiant reasonably relied on the issuing Judge's determination of probable cause.  Thus, suppression would not be warranted "as any mistake would have been on the part of the issuing Court and suppression would do nothing to deter police misconduct as contemplated by the exclusionary rule." *Id*. at 16.

## II.A. Affidavit established a sufficient nexus between the arson and the evidence sought, and a fair probability they would be found at Reed's premises.

The standard for reviewing the propriety of the issuance of a warrant under the Fourth Amendment is clear.  "The Fourth Amendment commands that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation.'" *United States v. Fiorito*, 640 F.3d 338, 345 (8th Cir. 2011) (quoting U.S. Const. amend. IV).  "The sufficiency of a search warrant is. . .determined on the basis of the information before the issuing judicial officer." *United States v. Reivich*, 793 F.2d 957, 959 (8th Cir. 1986).  "The warrant must be based upon a finding by a neutral and detached judicial officer that there is probable cause to believe the evidence, instrumentalities or fruits of a crime,

contraband,. . .may be found in the place to be searched." *Walden v. Carmack*, 156 F.3d 861, 870 (8th Cir. 1998).

Probable cause to issue a warrant exists when an affidavit sets forth sufficient facts to justify a prudent person in the belief that contraband will be found in a particular place. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983). Whether probable cause has been established involves the practical common-sense evaluation of the totality of the circumstances. *Gates*, 462 U.S. at 238. All that need be shown for probable cause to search is that there is a "fair probability" that contraband or evidence of a crime will be found at the location to be searched. *Gates, supra*. Also, affidavits should not be read in a hypertechnical manner. *See United States v. Ventresca*, 380 U.S. 102 (1965).

The quantum of evidence needed to meet this probable cause standard has been addressed by the Supreme Court on numerous occasions:

> In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

*Brinegar v. United States*, 338 U.S. 160, 175 (1979).

"[A] court reviewing a challenged warrant—whether at the district or appellate level—'must accord considerable deference to the probable cause determination'" of the issuing judge. *United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011) (quoting *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007). *See also United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007), citing *Gates*, 462 U.S. at 236 (same). Such deference derives not only from the law's recognition that probable cause is "a fluid concept" that can vary

with the facts of each case, but also from its "strong preference" for searches conducted pursuant to a warrant, *Illinois v. Gates*, 462 U.S. 213, 232, 236 (1983), and its related concern that "[a] grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting." *United States v. Ventresca*, 380 U.S. 102, 108 (1965).  With this backdrop, the task of a reviewing court is simply to ensure that the "totality of the circumstances" afforded the issuing judge "a substantial basis" for making the requisite probable cause determination.  *Illinois v. Gates*, 462 U.S. at 238 (internal quotation marks omitted).

"In determining whether probable cause exists," a reviewing court "do[es] not evaluate each piece of information independently; rather. . .all of the facts [are considered] for their cumulative meaning."  *United States v. Allen*, 297 F.3d 790, 794 (8th Cir. 2002) (citation omitted).  *Allen* found the information contained in a challenged search warrant affidavit connected the target residence to methamphetamine manufacturing.  The information included that an individual consented to a search after his car was stopped and an officer found items indicating the individual was involved in manufacturing methamphetamine.  The individual agreed to cooperate with law enforcement.  He told officers that he and Allen had spent the evening buying ephedrine pills and looking for anhydrous ammonia to steal.  The informant also stated that Allen had 20 soda cylinders and 30 lithium batteries in his possession or at his residence.  The Eighth Circuit found these facts "establish probable cause to believe that Allen had methamphetamine manufacturing equipment and ingredients at his home."  *Id*.

It is generally understood that "probable cause to search is demonstrated where the totality of the circumstances indicates a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *Walczyk v. Rio*, 496 F.3d at 156 (quoting *Illinois v. Gates*, 462 U.S. at 238). "This required nexus between the items sought and the 'particular place' to be searched protects against the issuance of general warrants, instruments reviled by the Founders who recalled their use by Crown officials 'to search where they pleased.'" *Clark*, 638 F.3d at 93 (quoting *Stanford v. State of Texas*, 379 U.S. 476, 481 (1965) (discussing how abusive use of general warrants contributed to Revolution and, thereafter, to demand for the Fourth Amendment)).

As observed by the First Circuit,

> The focus in a warrant application is usually on whether the suspect committed a crime and whether evidence of the crime is to be found at his home or business. That hardly makes the address unimportant: to invade the wrong location is a serious matter. But so long as the affidavit itself asserts *a link between the suspect and the address*, it is easy to understand how both the officer applying for the warrant and the [judge] might overlook a lack of detail on a point often established by the telephone book or the name on a mailbox.

*United States v. Procopio*, 88 F.3d 21, 28 (1st Cir. 1996) (emphasis added). Indeed, a simple Google search[2] of the target address results in a list of various sources identifying Jeffery Reed as the person connected with the residence. The failure of the Affiant to

---

[2]*See*https://www.google.com/search?q=1234+wayne+419+williamsville+mo&rlz=1C1GCEA_e
nUS1106US1107&q=1234+wayne&gs_lcrp=EgZjaHJvbWUqBwgAEAAYgAQyBwgAEAAYg
AQyBggBEEUYOTIICAIQABgWGB4yCAgDEAAYFhgeMggIBBAAGBYYHjIICAUQABg
WGB4yCAgGEAAYFhgeMg0IBxAAGIYDGIAEGIoFMg0ICBAAGIYDGIAEGIoFMg0ICRA
AGIYDGIAEGIoF0gEKMTQwMTVqMGoxNagCCLACAfEFGF2PxaFL9sTxBRhdj8WhS_bE
&sourceid=chrome&ie=UTF-8 (last visited Feb. 25, 2026).

directly state that the premises located at 1234 Wayne 419 was in fact Reed's residence and farm is more akin to a clerical error. The preferred practice is for the owner or occupant of property to be included in the property description of a Search Warrant.

The Fourth Amendment requires that a valid search warrant particularly describe the place to be searched, and the persons or things to be seized. U.S. Const. Amend. IV. The appropriate test for determining particularity is set out in *United States v. Gitcho*, 601 F.2d 369 (8th Cir. 1979). The description of the place to be searched is sufficient if it is described with sufficient particularity as to enable the executing officer to locate and identify the premises with reasonable effort and whether there is any reasonable probability that another location may be mistakenly searched. *Id* at 371. The Court should consider *the total circumstances surrounding the case* in determining whether a warrant fails for lack of particularity. *United States v. Fiorito*, 640 F.3d 338, 346 (8th Cir. 2011) (emphasis added).

"[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue." *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000). Reed alleges the primary infirmity of the affidavit relates to the issuing judge's inference that there was a "fair probability that contraband or evidence of a crime [would] be found" at the location specified in the Search Warrant when the affidavit did not present facts to indicate that location was in fact Reed's residence and a place the suspected contraband would likely be found.

One case Reed relies upon in support of this argument is *United States v. Rose*, wherein the Sixth Circuit concluded that although the search warrant identified the

defendant as the subject of the search at a specific address, the attached affidavit did not include the address.  714 F.3d 362 (6th Cir. 2013).  Those facts are dissimilar to what occurred in this case.  *Rose* held that the *search warrant* "tenuously linked the property to Rose" in that the defendant's name preceded the address and the physical description of the address notated that the name "Rose" appeared over the doorbell for apartment number one.  *Id*. at 366.  Nowhere in the *affidavit*, however, did the affiant provide Rose's address.  *Id*. at 364.  The Sixth Circuit found that the affidavit did not provide probable cause for a search of the listed address, because "[t]here is no way to read the affidavit and to conclude that the magistrate judge had a substantial basis for thinking that there was a fair probability that evidence of the crimes described in the affidavit would be found at [the address listed in the search warrant].  *Id*. at 366.  Next, the Sixth Circuit determined that the good-faith exception applied because exclusion would demand "a hyper-technical reading of the requirements of the Fourth Amendment." That exception will be discussed in section II.B.

The Eighth Circuit has observed that "[a]s a matter of common sense, it is logical to infer that someone in possession of valuable contraband would store that contraband in a safe, accessible location such as his or her residence." *United States v. Carpenter*, 341 F.3d 666, 671 (8th Cir. 2003).  Likewise, it is reasonable to infer that clothing a person wore and items he recently purchased would be found at the person's home. Such inferences have "common sense appeal" that is routinely accepted by an issuing judge, making it "not entirely unreasonable for [an officer] to believe the inference permissible." *Id*. at 672.  *See also United States v. Mahler*, 141 F.3d 811, 813-14 (8th

Cir. 1998) (where search warrants issued for multiple locations "issuing judge could reasonably infer that [storage] units were leased by either of the suspects whose drug activities were outlined in the [remainder] of the affidavits," including their drug activities at a shared apartment that was searched, their joint ownership of a van that was used to transport drugs, and fact the men had leased certain storage units although the affidavit did not specify who leased each of the three units).

The Government offered the following to show that the description of the place to be searched was facially sufficient:

> In this instance the search warrant itself states clearly and unequivocally that the location to be searched is "1234 Wayne 419, Williamsville, Missouri 63967. It is described as a single-story residence that faces west. There is an outbuilding located southwest of the property. A driveway leads from County Road 419 to the east portion of the premises which leads to a large barn/shop." GE # 1 at 1. That description provides sufficient detail that an officer unfamiliar with the location could locate 1234 Wayne County Road 419, Williamsville Missouri, 63967, with a reasonable amount of effort. The description is also specific enough to prevent someone mistaking another location for the target address.

(Doc. 47 at 5-6.) Regarding the nexus between Reed's residence and the evidence sought, the Government added:

> The entirety of the facts in the affidavit clearly point to Reed as the principle suspect in the arson fire. The affidavit states that the "suspect of an arson investigation", who based on the information in the affidavit, was indisputably Jeff Reed, was "located at the premises" that they sought to search. The rest of the affidavit goes to great lengths to establish the probable cause to believe that Reed is in fact the arsonist. The victim told officers that there was "one particular person who had a conflict with him; Jeff Reed." Reed had an ongoing financial dispute with the victim, knew that the victim kept a large amount of cash in the safe, which had been cut open, had threatened the

victim because he believed the victim had flirted with Reed's wife, and had bought a total of 30 Orion road flares, the same type of flares discovered at the scene of the arson fires, under suspicious circumstances in two separate incidents. Nothing other than a vivid imagination could lead one to conclude from the application and affidavit that the investigators were looking at anyone other than Jeff Reed as the possible arsonist at that point in time.

The affidavit then goes on to state that "Reed owns a farm approximately two nautical miles" from the scene of the arson. The description of the target premises in both the affidavit and the warrant as including a "primary residence, entire land, any and all outbuildings, shops, barns, or sheds" is certainly consistent with the target address being a farm. The fact that Reed and Buffington had a barter agreement where Reed used Buffington's farm equipment also supports the conclusion that Reed's premises was a farm, and in reasonably close proximity to Buffington's in order to make the use of Buffington's farm equipment a practical arraignment between the two men.

Reed's statement to the investigators that Buffington's farm hand Jimmy Freeman had called him the morning of the fire and threatened him, showing up "a short time later" at Reed's residence, is consistent with Reed's farm being in close proximity to the scene of the arson where Freeman worked. Reed's admission that he had "exited his home" at 3:00 am with a rifle to hide in the tree line when he thought that Freeman had shown up to carry out his threats is also consistent with Reed residing at the rural property as described in the warrant.

*Id*. at 7-8.

The Search Warrant sought authority to search for items of evidence "that could potentially lead to further details surrounding the arson investigation in that the described items could incriminate or exclude possible witnesses/suspects." (Doc. 39-2 at 1-2, 7.) The list of items to be searched for fell into three categories:  1) documentary evidence whether in paper or electronic form (on computers and cell phones, vehicle GPS devices), 2) items that could have been used to commit the arson including the items Reed

purchased from Menard's, or their packaging (*i.e.*, Gorilla tape, Orion Flares and related packaging, lighters, chemical and utility gloves); and, 3) clothing items that could have been worn during the arson and when Reed purchased the flares and other materials at Menards. *Id*.

Arson was the crime under investigation. The details in the Affidavit suggest Reed had a financial and personal motive to commit arson at Buff Beef. The Affidavit discussed the dispute between Reed and Buffington. Reed did not deny that he and Buffington had a dispute when interviewed by law enforcement. As to the first category of evidence, common sense suggests that financial records and other documents, whether in paper or electronic form, may contain information relevant to the investigation. Similarly, GPS data in vehicles that could have been used during travel to Menards or the location of the arson would also be relevant. Regarding the second and third categories of evidence, items that could have been used to commit arson would be pertinent to the investigation including physical items like the flares, lighters, and gloves, as well as clothes worn during the purchase of said items or use of the items during the arson.

Further discussion regarding the request to search for computers, other electronic smart devices, and cellular phones is warranted. Several such items were seized during the search, including two cell phones, one computer, two laptops, two flash drives, and one hard drive were seized pursuant to the warrant. Reed argues that the Affidavit fails to establish that the premises to be searched contain "computers or other electronic devices belonging to Reed," and offers no suggestion "that Reed used electronic devices to

commit the alleged arson or stored information relating to that suspected crime thereon."

(Doc. 39-1 at 14.)

The Government explained that there was a sufficient connection between the

arson and electronic devices, as well as documentary evidence, and a fair probability

those items would be located at Reed's residence.  The Government's argument on this

point is set out below.

> The warrant sought to locate and seize "computers and other
> electronic smart devices (Including cellular phones)" as well as "any written
> notes/documentation pertaining to information leading up to or explaining the
> arson". The affidavit discusses the financial dispute between Reed and the
> victim which involved a significant amount of money and resulted in the send-
> ing of invoices and demands for payment back and forth. People commonly keep
> such records in both paper and electronic form, which would reside on computers
> and other electronic devices in their homes and places of business.
>
> Evidence of the financial dispute, as well as evidence of Reed's financial
> status generally, relates in part to Reed's motivation to commit the crime. Reed
> was apparently in financial difficulty, as evidenced by his desire to cancel the
> barter agreement and get cash instead, Reed believed that Buffington owed him a
> large sum of money, knew that the victim kept a large sum of money in the safe at
> the farm, and the safe had been blowtorched open but nothing was stolen, as the
> money had been removed prior to the fire. Judge Schrum reasonably concluded
> that there was probable cause to believe evidence of this nature would be located
> both in paper records and electronic media such as computer devices and
> electronic memory storage devices at Reed's.

(Doc. 47 at 10.)

The Affidavit did not include any statements about the Affiant's training and

experience related to the use of such items by criminals in the commission of crimes.

These days, it is rare for law enforcement officers searching a person or place to not find

cell phones and electronic devices.  It was reasonable for both the issuing judge and Affiant to infer an individual suspected of committing an arson may possess cell phones and other electronic devices containing information related to the crime under investigation, especially where the suspected arsonist and victim were engaged in a financial dispute.  Probable cause does not require conclusive evidence that links a particular place or item to a crime. *United States v. Anderson*, 450 F.3d 294, 303 (7th Cir. 2006) (citation omitted). "Rather, issuing judges may draw reasonable inferences about where evidence is likely to be found based on the nature of the evidence and the offense." *United States v. Zamudio*, 909 F.3d 172, 175 (7th Cir. 2018). In other words, "[t]he Fourth Amendment does not require certainty that a search will uncover the sought-after evidence; a fair probability is enough." *United States v. Aljabari*, 626 F.3d 940, 946 n. 1 (7th Cir. 2010).

Although several electronic devices were seized pursuant to the Search Warrant, a search of those devices would have required additional authority.  The record is devoid of information regarding whether the devices were searched.  No motions have been filed to challenge any searches of those devices.

In reviewing the Affidavit, due deference is afforded to the issuing judge's probable cause finding by examining the "cumulative meaning" of all the information presented.  As argued by the Government, Reed was the central suspect of the investigation.  The investigation revealed that Reed and Buffington were both farmers and lived a short distance apart in rural Wayne County.  The pair had an ongoing dispute over money that began approximately one year before the fire.  Additionally, Reed

threatened Buffington's life due to Buffington flirting with Reed's wife.  While they were friends, Reed learned that Buffington typically kept between $50,000 to $100,000 in a safe at Buff Beef.  This was something few people knew.  Reed was also familiar with the layout of the buildings, safe, and equipment at the farm.  Buffington reported that he removed the money prior to the fire.  The safe was reportedly opened with a torch but nothing was believed to have been removed from the safe during the arson.  Use of a torch to open the safe is an indication the person who wanted access to the contents did not have the combination.  Reed's description of his property during his interaction with one of Buffington's farmhands the morning of the fire is consistent with the premises described in the Search Warrant. One of the most significant details supporting probable cause for a search of Reed's property is that surveillance footage from the local Menards showed Reed purchasing a total of thirty Orion flares, like those found throughout the scene of the arson, within between one and three weeks before the fire was set at Buff Beef.

At the conclusion of the Affidavit, the Affiant stated "[b]ased on the foregoing, I have probable cause to believe that evidence related to the crime currently under investigation is located on the described premises." (Doc. 39-2 at 7.)  The Affidavit noted that the investigation was related to the arson, and the premises was where "a suspect" of the investigation was located. *Id*. at 3.  The information within the four corners of the Affidavit pointed toward Reed being that suspect.

On the facts presented here, the issuing judge had a "substantial basis" for authorizing the Search Warrant.  While minimally stated, there was a factual basis for the

issuing judge to infer that when the Affiant stated the "crime under investigation involves a suspect of an arson investigation located at the premises of 1234 Wayne 419," the Affiant was referring to Jeffery Reed as the suspect of the investigation and identifying the premises as Reed's property.   This Court does not condone the Affiant's failure to directly state that Reed was connected to the target premises.  The best practice would have been for the Affiant to articulate his basis of knowledge, which would have avoided this issue.

Considering all the information set forth in the Affidavit, the issuing judge had a "substantial basis" 1) to infer that Reed had a connection to the premises at 1234 Wayne 419, and 2) to find that there was probable cause to believe the items sought may be found at the premises.

## II.B.   Good faith

Alternatively, the undersigned will assume that the infirmities alleged in the Application and Affidavit for Search Warrant, viewed collectively, were not sufficient to demonstrate a nexus between Reed, the location, and the contraband.

Under *United States v. Leon*, 468 U.S. 897 (1984), the question of whether an officer's reliance on an issued warrant was objectively reasonable is a question of law. *United States v. Carpenter*, 341 F.3d 666, 668 (8th Cir. 2003).  Reed claims this exception does not apply because the Affidavit contained "no discussion or factual connection to the premises" and the lack of nexus "would have been apparent to reasonable officers precluding application of the 'good faith' exception…" (Doc. 39-1 at 17.)  Reed also anticipated he would rely on "evidence to be adduced at the forthcoming

evidentiary hearing." (Doc. 48 at 4.)  Considering the entire record, it is likely Reed expected to cross-examine the Affiant about the alleged omissions highlighted in his Supplemental Brief and the Motion for *Franks* hearing that was filed after the deadline for filing pretrial motions.

Reed correctly stated that the "good faith" exception does not apply in any of the following scenarios: (1) where the affiant deliberately or recklessly misled the judge; (2) where the judge wholly abandoned his or her judicial role; (3) where the warrant affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the warrant is so facially deficient that no police officer could reasonably presume it valid. *See United States v. Leon,* 468 U.S. 897, 923 (1984).  Under *Leon*, "evidence obtained pursuant to a search warrant that is later found to be invalid is not suppressed if the executing officers reasonably relied in good faith on the issuing court's determination of probable cause and technical sufficiency."  *United States v. Herron*, 215 F.3d 812 (8th Cir. 2000) (citing Leon, 468 U.S. at 922).

As to the first scenario, there is no evidence the Affiant deliberately or recklessly misled the judge.  The Affiant summarized important details about the arson under investigation, the relationship between Reed and Buffington, as well as how Reed had motive and opportunity to commit the arson. No argument was presented in support of the second scenario.

Reed's attack engages the third "good faith" scenario.  In assessing whether an affidavit lacks indicia of probable cause rendering official belief in it unreasonable, a reviewing court is "bound by the four corners of the affidavit, and [ ] may not consider

what the officer executing the warrant knew or believed." *Rose*, 714 F.3d 362, 367.[3]

Reed relies on *United States v. Herron*, wherein the Government conceded on appeal that the search warrant for the defendant's residence was not supported by probable cause. 215 F.3d 812 (8th Cir. 2000). In that case, law enforcement used the same affidavit to apply for Search Warrants to be executed at Herron's residence and his brother's residence, the Buck farm. The Eighth Circuit concluded that although "the same affidavit can support probable cause at more than one location, here the affidavits were designed to support a search warrant for the Buck farm and applied to the Herron residence as an afterthought." *Id*. at 815. *Herron* observed that "the affidavits barely touch on the Herron residence or Mr. Herron and then only in a way incidental to the Buck investigation." *Id*. at 814. The previous section conducted a detailed analysis of how the instant Affidavit had a sufficient nexus between Reed and the place to be searched as well as evidence to be seized. The circumstances in this case are distinguishable from *Herron*.

Reed also relies on the *Rose* case, discussed above. *Rose* concluded there was an insufficient nexus between the place to be searched and the suspect, but concluded that "[f]inding the good-faith exception does not apply in this case because the affidavit failed to provide the address listed on the warrant would be a hyper-technical reading of the requirements of the Fourth Amendment." 714 F.3d 362, 367. *Rose* and the instant case

---

[3] The Court notes that two of the references relied upon by Reed (*Troxel* and *Chong*) as to the Government's burden to present evidence do not properly state the holdings of those cases. *See* Doc. 58 at 3.

are similar in that "the failure to link evidence of criminal activity to the address searched was really a by-product of the fact that the affidavit 'completely neglect[ed] to indicate why the affiant believed that [the defendant] himself had any connection with the [address].'" *Id.* at 369 (quoting *United States v. Van Shutters*, 163 F.3d 331, 336).   It is true that the instant Affidavit failed to directly state a link between Reed and 1234 Wayne 419, Waynesville, Missouri.  That said, the Affiant articulated a belief that evidence relevant to the arson investigation would be found at the described premises where "a suspect" of the investigation was located and Reed was the only suspect discussed.  There was considerable information supporting that Reed had motive, opportunity, and possession of the items used to commit the arson at Buff Beef based on his purchase of thirty Orion flares within the two weeks prior to the fire.  Like the *Rose* court concluded rather than raising "fears of police misconduct, this case merely raises concerns about sloppiness in drafting affidavits within" the agency responsible for drafting it.  714 F.3d 362, 369 (6th Cir. 2013).

The Court in *Leon* determined that "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges…," and that "there exists no evidence suggesting that judges [ ] are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion." *United States v. Carpenter*, 341 F.3d 666, 669 (8th Cir. 2003) (quoting *Leon*, 468 U.S. at 916).  The distinction in motivations between neutral and detached judges compared to law enforcement officers "'who are engaged in the often competitive enterprise of ferreting out crime,'" is important as it led the Supreme Court

Page **28** of **38**

to hold "that the exclusionary rule could be modified to permit the admission of evidence seized by officers who act in objectively reasonable, good faith reliance upon issued warrants." *Id*. (quoting *Leon*, 468 U.S. at 914, 922).

In *Procopio*, FBI investigation of a robbery led agents to secure arrest warrants for two of the suspects along with a search warrant for 79 Intervale, which was believed to be the residence of one of the suspects, Kiley. 88 F.3d 21 (1st Cir. 1996). When they arrived at that location, they learned that Kiley lived in unit 81 Intervale which was on the third floor of the same building as unit 79. An amended warrant was issued upon application by an agent who relayed that she had been advised that the correct address for Kiley was 81 Intervale rather than 79. The district court found the warrant should not have been issued because nothing in the affidavit established that Kiley lived at 81 Intervale, however, the good faith exception applied. In its *de novo* review, the First Circuit observed that "the only omission was to explain how the agent—who had ample basis for the contention—knew that '81 Intervale' was 'Kiley's address.'" *Id*. The First Circuit applied *Leon* concluding "[w]hether or not this is a defect in the application, it is hardly blatant, nor is there any suggestion (or basis for a suggestion) of actual bad faith. *Id*. The Affiant minimally articulated that the target residence belonged to Reed. While he could have directly stated the connection, there is no suggestion that his failure to do so was in actual bad faith. Nor does it provide a basis to preclude application of the good faith exception.

Reed also complains that the Search Warrant was "facially deficient" as it authorized officers to search the property for evidence of a "homicide" instead of an

arson case. (Doc. 39-1 at 17.) The undersigned finds that reference to a homicide investigation was a clerical error as every other time the investigation is described, the crime being investigated is described as arson. The Affidavit provided that "[t]he crime under investigation involves a suspect of an arson investigation…" (Doc. 39-2 at 3.) In the list of items to be seized, which appears in the Affidavit and the Search Warrant, number two is related to "explaining the arson," number eight is "any clothing. . .related to the arson investigation," number ten expresses all the items "could potentially lead to further details surrounding this arson investigation…" *Id*. at 1, 7. "There was no ambiguity on the face of the warrant, much less fatal ambiguity that would have made execution of the warrant objectively unreasonable." *Carpenter*, 341 F.3d at 673.

The Affidavit did not contain false or misleading information. The absence of various pieces of information identified by Reed did not mislead the judge who issued the Search Warrant. Reed was identified as a suspect of the arson investigation. Additionally, the items to be searched for were expected to "lead to further details surrounding the arson investigation in that the described items could incriminate or exclude possible witnesses/suspects." (Doc. 39-2 at 7.)

The contents of the Affidavit relayed that Reed was a suspect in the arson investigation who had motive to harm Buffington based on their falling out, Reed's concern Buffington was interested in his wife, and their money dispute, plus Reed's recent possession of items that were the same brand as those used in the subject arson. These facts were thoroughly described in the affidavit satisfying the "not so lacking" standard necessary for *Leon's* good faith exception to be applied. The undersigned

Page **30** of **38**

"cannot say it was entirely unreasonable for [the Affiant] to rely on the issuing [judg]e's willingness to infer the requisite nexus. *Carpenter*, 341 F.3d at 672 at n.3 (citing *United States v. Allen*, 297 F.3d 790, 794 (8th Cir. 2002).

Based on the foregoing, should the Search Warrant be found to not support the issuing judge's probable cause finding, the undersigned alternatively recommends that the good faith exception be applied.

## II.C.  *Franks* challenge

Next, Reed challenges the validity of the Search Warrant under the rationale of *Franks v. Delaware*, 438 U.S. 154 (1978).  To succeed in a *Franks* challenge based on omissions of fact, a defendant must "prove first that facts were omitted with the intent to make, or in reckless disregard of whether they make, the affidavit misleading, and, second, that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause." *Allen*, 297 F.3d at 795.  (Citation omitted.)  Mere negligence or innocent mistake is insufficient to void a warrant. *See Franks*,  438 U.S. at 156.

Reed argues that the Affiant was "married to Mr. Buffington's daughter. . .and has at least two children with her" making him a prior son-in-law.  (Doc. 60 at 2.)  Reed claims that the Affiant's participation in the investigation was in violation of MSHP Rules because his involvement "had a significant potential for a conflict of interest, created the appearance of a conflict, raised a question of his impartiality" in that he may have financial interests in assisting Buffington. *Id*. at 3-4.  He claims this omission "had a significant bearing on the credibility of the facts provided in the Affidavit" supporting an inference of recklessness "even if the omission was not intentional." *Id*. at 4.  To

support this argument, Reed cites a number of cases that examine informant credibility issues which are inapplicable here as the "informant's" were not law enforcement officers. He asserted that if the Affiant had disclosed his familial relationship with Mr. Buffington, the issuing judge "may have inferred" the Affiant's information "was biased and /or the product of improper motivations…." *Id*. at 6.

Reed attached MSHP Rules of Conduct for Employees Number 26-02-2174 issued on December 4, 2025, after the offense date in this matter. Assuming similar rules were in place prior to August 25, 2023, the undersigned is not persuaded there was a violation of the rules of conduct. The fire at Buff Beef resulted in a multi-agency collaborative effort to find who was responsible for the crime. Securing a Search Warrant for one of the primary suspects who recently made a large purchase of the exact brand of flares used in the fire under investigation was a necessary part of the investigation. Although the Affiant was a former son-in-law of the victim, the circumstances presented do not raise questions related to the prohibited conduct cited in the MSHP Rules of Conduct.

Reed also argues that the Affiant further misled the issuing judge by omitting additional "suspicious circumstances" from the Affidavit, including:

(1) that Mr. Buffington removed the surveillance cameras from his property shortly before the fire, supposedly for "yearly maintenance";

(2) the suspicious timing of when Mr. Buffington removed of the cash contents of his safe prior to the arson—approximately three days beforehand—while the Affidavit only notes that he "had taken it out";

(3) that investigators executed a Google Geo-Fence search warrant and determined

that only one cellular device was present at the Buffington Property during the suspected commission of the arson—a device that "stays near or at Jimmy Freeman's residence"—which is located on the same property;

(4) that Freeman's son, Eric Freeman, had previously set one of Mr. Buffington's barns on fire, and then stole a pistol from him, according to Mr. Buffington himself; and

(5) that Mr. Buffington's son, Ryan Buffington, told investigators he knows Reed well and did not suspect Reed was involved in the arson; "he couldn't even see Reed asking or telling anyone to do something like this", according to the investigator's report.

*Id*. at 6-7.  Reed argues that the above information "points toward Mr. Buffington and/or Mr. Freeman as the perpetrator(s) of the arson" and that including the "information would preclude a finding of probable cause." *Id*. at 7.  Finally, "on information and belief" Reed claims that the Affiant first presented the warrant application to another judge "who refused to authorize the warrant" in Wayne County resulting in the Affiant presenting it to a "more distant judge. . .in Iron County." *Id*.  Notably, Reed failed to present any affidavits or documentation to support any of the above contentions.

The Government responded that Reed's Motion to Suppress related "solely to the sufficiency of the search warrant documents, particularly the Affidavit" and when the Government simply offered the Search Warrant documents at the hearing Reed objected. (Doc. 62 at 3.)  The Government asserts that the  "reason for [objecting] was because they apparently intended to engage in either a discovery deposition, or just general impeachment of the affiant." *Id*.

In opposition to the Government's explanation regarding why there was no need for testimony, defense counsel stated:

> …that's exactly what this hearing would be, to show all of the omissions that were not in the affidavit that we think are very significant, not the least of which is upon information and belief, I believe this affiant is actually the son-in-law of the alleged victim in this case, which would make him the grandfather of the alleged victim of this crime, which was not – which was not stated in the affidavit, which I think on itself is a very significant piece of information and goes to bias and goes to the bias as to how he would come upon Mr. Reed as a suspect and leaving out these other individuals that are equally plausible suspects just on the face of things."

(Hearing Transcript, Doc. 55 at 4-5.)

The Government now argues "[i]t is painfully obvious from counsel's comments in this respect that the intended cross examination of the affiant was solely about getting traction for a defense at trial – finding bias and posturing for an alternate perpetrator theory – and not about an attack upon the validity of the search warrant affidavit…" (Doc. 62 at 3.)  When the undersigned inquired of defense counsel as to the fact a *Franks* hearing had not been requested, defense counsel acknowledged that was true.  (Doc. 55 at 6.)

Reed now asks leave file his Motion for *Franks* Hearing out of time.  It appears the Motion was not filed prior to the hearing so that the alleged omissions could be used as cross-examination material on the good faith argument.  Even so, Reed will be granted leave to file the Motion out-of-time.

In *Franks*, the Supreme Court cautioned that, only in certain circumstances, the Fourth Amendment will entitle a defendant to an evidentiary hearing regarding the

accuracy of a search warrant affidavit. *See Franks*, 438 U.S. at 155-56. Therefore, a defendant is not automatically entitled to an evidentiary hearing under *Franks*. "There is … a presumption of validity with respect to the affidavit supporting [a] search warrant." *Franks*, 438 U.S. at 171. A defendant's conclusory allegations of false or omitted information are insufficient. *Id*. "

"The 'substantial preliminary showing' requirement needed to obtain a *Franks* hearing is not lightly met." *United States v. Milton*, 153 F.3d 891 at 896. Indeed, in *Franks*, the Supreme Court was careful to articulate what it meant by a substantial preliminary showing:

> To mandate an evidentiary hearing, <u>the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine</u>. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and <u>those allegations must be accompanied by an offer of proof</u>. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. <u>Affidavits or sworn or otherwise reliable statement of witnesses should be furnished, or their absence explained</u>. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted...is only that of the affiant, not of any nongovernmental informant.

438 U.S. at 171. (emphasis added)

The Government argued that:

> …Reed seeks to do precisely what *Franks* prohibits, namely, to cross examine the affiant in an effort to find ammunition to use in his defense. A careful examination of Reed's claimed basis for his need for a *Franks* hearing discloses two classes of alleged omissions, things which were disclosed to the defendant in discovery more than a year before and recently discovered items which Reed now claims were "omitted intentionally or recklessly to mislead the magistrate."

(Doc. 62 at 5-6.)

To resolve the Motion, the undersigned will assume without finding that the information was omitted with reckless disregard to whether it made the Affidavit misleading. In making that finding, the undersigned must next consider whether supplementing the Affidavit with the information would result in a lack of probable cause. First, the Affiant's status as the former son-in-law to Mr. Buffington does not impact the probable cause analysis. The Affiant also failed to mention that in addition to the MSHP, the ATF, Wayne County Sheriff's Office, and the Missouri Fire Marshals Office were collaborating in the investigation. Including the Affiant's relationship to Buffington and the involvement of multiple agencies in the investigation does not negate the probable cause finding.

The parties agree there was a dispute between Buffington and Reed, giving Reed motive to commit arson at Buff Beef. The Affiant included the fact the surveillance cameras at Buff Beef had been removed although it was not clear that the removal occurred three days before the fire. That information does not reduce the probable cause determination.

The three remaining omissions include: 1) results from a geofence search warrant that showed a single person (one of Buffington's farmhands) was in the vicinity of the arson during the time frame of the arson, 2) Mr. Buffington's son's opinion that he couldn't imagine Reed was responsible for the fire, and 3) fact that the farmhand's son had previously set one of Mr. Buffington's barns on fire and stolen a pistol from him in the past. These are pieces of information that will surely be discussed at trial, however, the addition of this information would not eliminate

Page **36** of **38**

the probable cause finding.

At bottom, the highlighted omissions do not reduce the strength of the information supporting the issuing judge's probable cause finding. In particular, the dispute between Buffington and Reed as to money and Reed's wife, Reed's apparent financial difficulties, and the video-recordings from Menard's that show Reed purchased the exact type of flares used in the fire at Buff Beef. The purchases were on two separate dates within the three weeks preceding the fire. This information enabled the issuing judge to conclude that Reed had motive and the opportunity to commit the arson in question.

In summary, the undersigned concludes that supplementing the Affidavit with the omissions cited does eliminate probable cause. Thus, Reed failed to meet the requirements under *Franks*. Reed's Motion for *Franks* Hearing should be denied.

### II.D.   Statements

Reed also requests that statements he made following the execution of the Search Warrant be suppressed. He did not argue that his statements were involuntary or that there was a violation of *Miranda v. Arizona*, 384 U.S. 436, 448-450 (1966), thus those issues are not considered.

"[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *United States v. Riesselman*, 646 F.3d 1072, 1078 (8th Cir. 2011) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)). "[T]he defendant bears the initial burden of establishing the factual nexus

between the constitutional violation and the challenged evidence." *United States v. Marasco*, 487 F.3d 543, 547 (8th Cir. 2007).

The undersigned concluded that Reed's property was searched pursuant to a valid Search Warrant. Because Reed has not shown that the search was unlawful, none of his statements constitute fruit of the poisonous tree. *See United States v. Goodale*, 738 F.3d 917, 922 (8th Cir. 2013) (Where search of laptop did not violate Goodale's constitutional rights, his statements were not fruit of the poisonous tree.).

Reed's request for suppression of his statements should be denied.

### III. Conclusion

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that the Defendant's Motion to Suppress Evidence and Statements (Doc. 39) and Motion for a *Franks* Hearing (Doc. 59) be **denied**.

Further, the parties are advised that they have fourteen days, or not later than March 13, 2026, to file written objections to this Report and Recommendation, unless an extension of time for good cause is obtained. Failure to file timely objections may result in a waiver of the right to appeal questions of fact. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

/s/ *Abbie Crites-Leoni*
United States Magistrate Judge

Dated: February 27, 2026